IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

NORTHERN NATURAL GAS
COMPANY,

                    **Plaintiff,**

v.

AMERICAN WARRIOR, INC.,

                    **Defendant.**

**Case No. 25-1120-DDC-ADM**

## MEMORANDUM AND ORDER

Plaintiff Northern Natural Gas Company alleges that defendant American Warrior, Inc. installed a guy-line anchor directly above its natural-gas pipeline. Plaintiff claims it cautioned defendant to notify plaintiff before digging near the pipeline. But defendant didn't heed this warning. And although defendant didn't damage the pipeline, plaintiff spent over $100,000 shutting down the gas flow within the pipeline and inspecting it for damage. Defendant has filed a Motion to Dismiss (Doc. 9), arguing that it didn't owe any duty to notify plaintiff before it installed the anchor, and that Kansas law doesn't allow parties to recover purely economic loss. This Order grants in part and denies in part defendant's motion, as the court now explains.

### I.       Background

The court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to [plaintiff], the non-moving party." *Purgatory Recreation I, LLC v. United States*, 157 F.4th 1173, 1182 (10th Cir. 2025) (quotation cleaned up).

Plaintiff is a pipeline operator. Doc. 1 at 2 (Compl. ¶ 5). Defendant is an oil and gas production company. *Id.* at 2–3 (Compl. ¶ 6). Plaintiff owns an easement on property in Rice County, Kansas, within which it operates a natural-gas pipeline. *Id.* at 4–5 (Compl. ¶¶ 18–20). Defendant owns an oil and gas lease on the property. *Id.* at 5 (Compl. ¶ 21). In connection with this lease, defendant operates an oil well. *Id.*[1] Defendant knew that plaintiff operated a pipeline near the well, and knew also where the pipeline was located. *Id.* at 6–7 (Compl. ¶¶ 25–28). Defendant also had notice that plaintiff would have to re-excavate any digs performed without plaintiff's notice and that plaintiff would pass on these costs to defendant. *Id.* at 8–9 (Compl. ¶¶ 30–32).

In February 2025, one of plaintiff's employees discovered that defendant, while performing repairs on its oil well, had drilled a large guy-line anchor directly above its pipeline. *Id.* at 9, 13 (Compl. ¶¶ 33–34, 52). Defendant hadn't called 811 or notified plaintiff before digging. *See id.* at 10 (Compl. ¶ 35). Plaintiff's employee instructed defendant to leave the anchor in place. *Id.* If the anchor had struck plaintiff's pipeline, then removing the anchor could have caused catastrophic damage. *Id.* (Compl. ¶ 36). Plaintiff owed a regulatory duty to adopt policies and procedures governing its response to potential hazards. *Id.* at 4 (Compl. ¶¶ 16–17).[2]

---

[1]    The Complaint isn't altogether clear about whether the well produces oil or gas. The parties' other filings refer to the well as an oil well. *E.g.*, Doc. 9 at 2; Doc. 12 at 1. The court thus assumes that the relevant well here produces oil. In the end, this assumption is insignificant because Kansas law relevant to this motion treats oil and gas wells identically. *See* Kan. Stat. Ann. § 66-1802(d) (exempting "operations related to exploration and production of crude oil or natural gas, or both" from the Kansas Underground Utilities Protections Act).

[2]    The mere existence of these regulatory obligations is a legal conclusion, which the court isn't bound to accept as true. *See Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012). But the court agrees with the gist of this legal conclusion. Federal regulations obligate pipeline operators to "establish and follow procedures for investigating and analyzing incidents[.]" 49 C.F.R. § 192.617(a).

These policies and procedures required plaintiff "to ascertain the scope and nature" of any potential hazard. *Id.*

Consistent with these policies, plaintiff executed an emergency response to assess "potential damage and to mitigate the extreme hazard" presented by the guy-line anchor. *Id.* at 11 (Compl. ¶ 44). Plaintiff first turned down the pressure of the gas pipeline. *Id.* (Compl. ¶¶ 45, 47). It then performed a hydro excavation, which revealed that the bottom of defendant's anchor was about 10 inches above plaintiff's pipeline. *Id.* at 11–12 (Compl. ¶¶ 47–48). The following day, plaintiff performed a second inspection, which confirmed that the anchor hadn't damaged its pipeline. *Id.* (Compl. ¶ 50). Plaintiff lost more than $68,000 worth of natural gas when it reduced the pressure in the pipeline. *Id.* at 13 (Compl. ¶ 55). And it spent some $45,000 executing its emergency response. *Id.* at 13–14 (Compl. ¶ 56).

Based on these events, plaintiff asserts two claims against defendant: one for negligence and one for fraud by silence. *Id.* at 14–17. Defendant seeks to dismiss both claims. The court covers the legal standard governing defendant's motion, next.

## II.    Legal Standard

Under Rule 12(b)(6), a party may move the court to dismiss an action for failing "to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more

than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir. 2009) ("The question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." (citation omitted)).

When considering a Rule 12(b)(6) motion to dismiss, the court must assume that factual allegations in the complaint are true, but it's "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). And, while this pleading standard doesn't require "'detailed factual allegations,'" it demands more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, as the Supreme Court explained, "'will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

## III.    Analysis[3]

The court starts with defendant's attack on plaintiff's negligence theories. It then drills down on defendant's argument that the economic-loss doctrine bars plaintiff's claims. Finally, the court addresses defendant's requested dismissal of plaintiff's fraud claim.

### A.    Negligence Theories

Defendant seeks to dismiss plaintiff's negligence claim because, it argues, it didn't owe plaintiff any duty. Plaintiff advances two theories to support its negligence argument. *First*,

---

[3]     Though no party has briefed the issue expressly, all parties seem to agree that Kansas law governs this action. The court concurs. "The Court applies the forum state's choice-of-law rules to determine which state's substantive law governs a claim." *Nordwald v. Brightlink Commc'ns, LLC*, 603 F. Supp. 3d 1030, 1040 (D. Kan. 2022) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Where, as here, "a party fails to make 'a clear showing that another state's law should apply,' Kansas choice of law principles require a court to default to Kansas substantive law." *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 982 (10th Cir. 2014) (quoting *In re K.M.H.*, 169 P.3d 1025, 1032 (Kan. 2007)). The court thus applies Kansas law.

plaintiff asserts that the Kansas Underground Utility Damage Prevention Act (KUUDPA) created a public duty requiring defendant to give notice before it dug in the vicinity of plaintiff's pipeline. Doc. 1 at 14 (Compl. ¶ 60); Doc. 12 at 3–7. And *second*, defendant owed a common-law duty to exercise reasonable care, but it failed to do so when it failed to contact plaintiff before installing the anchor. Doc. 1 at 14 (Compl. ¶ 61); Doc. 12 at 7–8. Take these duty sources in turn.

### 1. KUUDPA

"The KUUDPA requires diggers to inform a centralized 'notification center' of their intent to dig before they start excavating." *Kan. One-Call Sys., Inc. v. State*, 274 P.3d 625, 630 (Kan. 2012); *see also* Kan. Stat. Ann. § 66-1804(a) (requiring excavators to serve notice before excavation); Kan. Stat. Ann. § 66-1805(d) (requiring excavators to serve this notice by calling a notification center). But the Act only regulates "excavators." Kan. Stat. Ann. §§ 66-1803, 66-1804(a). "'Excavator' means any person who engages directly in excavation activities[.]" Kan. Stat. Ann. § 66-1802(e).

The parties disagree whether the KUUDPA applies here. Their debate centers on the Act's definition of "excavation." In relevant part, this definition provides: "'Excavation' means any operation in which earth, rock or other material below the surface is moved or otherwise displaced by any means, except . . . operations related to exploration and production of crude oil or natural gas, or both." Kan. Stat. Ann. § 66-1802(d). The issue then is whether defendant's operations—repairing an oil well—are "related to exploration and production of crude oil[.]" *Id.* They plainly are. Why repair an oil well if not to produce oil from it? And the operative statute uses broad language: "related to." Operations to repair an oil well bear a connection to oil production and thus are "related to" oil production under any definition of the phrase. *See*

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (defining "relating to" as "'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with'" (quoting *Relate*, Black's Law Dictionary (5th ed. 1979))).

Plaintiff's contrary arguments never produce any momentum to support its position. The crux of plaintiff's position is that the "Kansas Legislature recognizes a clear distinction between oil and gas production and those activities associated with making a well operable so that production may be possible." Doc. 12 at 6. According to plaintiff, the legislature expressly excluded oil and gas "production" and "exploration" from KUUDPA's scope. And, plaintiff points out, the legislature didn't use terms like "construction," "maintenance," or "repairs" when wording this exclusion. So, in plaintiff's view, the legislature, by not using these terms, intended for the KUUDPA to apply to a situation like this one, and thus it obligated defendant to notify plaintiff before making any repairs to the oil well. *Id.* But plaintiff's argument conveniently ignores the statute's use of the phrase "related to." Kan. Stat. Ann. § 66-1802(d). Kansas law doesn't just exempt "production" and "exploration" activities. It exempts all "operations *related to* exploration and production of crude oil[.]" *Id.* (emphasis added). And plaintiff never explains how repairing an oil well isn't related (and closely related at that) to the "production of crude oil."

Plaintiff also cites an enforcement letter from the Kansas Corporation Commission to support its interpretation. Doc. 12 at 6–7 (citing Doc. 12-4 (Pl. Ex. C)). But that letter merely explains that the KCC "identified possible violations committed by" defendant. Doc. 12-4 at 1 (Pl. Ex. C). Given this letter's wishy-washy language, even if the court considers this filing—an issue the court needn't decide—it wouldn't move the needle. The KCC's filing contains no legal analysis or persuasive reasoning why defendant's conduct came within reach of the KUUDPA.

In short, the plain language of the KUUDPA excludes operations related to production of crude oil. Because repairing an oil well relates to oil production, defendant's alleged conduct falls beyond the scope of the KUUDPA. The KUUDPA thus didn't impose a duty on defendant to notify plaintiff of its digging activities. And so, to the extent that plaintiff bases its negligence claim on defendant's duty under the KUUDPA, that claim fails as a matter of law. But that's not the end of the pipeline for plaintiff's negligence claim because plaintiff asserts an alternative source of defendant's duty. Next, the court takes up plaintiff's alternative theory, which contends that defendant violated a common-law duty.[4]

### 2. Common Law

The court reaches a different result on plaintiff's common-law theory. The Kansas Supreme Court has articulated a "universal rule" that everyone "is under a duty to exercise reasonable care . . . to avoid injury to others." *Striplin v. Kan. Gas & Elec. Co.*, 461 P.2d 825, 828 (Kan. 1969); *see also Jones v. Hansen*, 867 P.2d 303, 311 (Kan. 1994) ("A cardinal principle of tort law today is that *all persons* should be required to use ordinary care under the circumstances to prevent others from being injured as the result of their conduct." (emphasis in original) (quotation cleaned up)). And, Kansas courts recognize, this common-law duty applies equally to excavators, including ones not subject to the KUUDPA. *See Rural Water Dist. No. 3 v. Miller Paving & Constr., L.L.C.*, 190 P.3d 973, 979 (Kan. Ct. App. 2008) (explaining that under common law, "an excavator can be held liable on a theory of negligence where the excavator knew of the existence of an underground facility or should have known that buried utilities would be found in or near the excavation sites and failed to exercise ordinary care").

---

[4] Because the court concludes that defendant qualifies for KUUDPA's oil and gas exception, it need not consider defendant's argument that plaintiff's damages aren't cognizable under the KUUDPA.

Given this broad duty of reasonable care, the central issue in this case—whether plaintiff can succeed on its negligence claim based on defendant's failure to notify plaintiff of its dig—turns on the question of breach, not duty.  That is, defendant owed plaintiff, as a matter of law, a duty to exercise reasonable care when it installed the guy-line anchor.  *See id.*  Whether defendant violated that duty is a question of breach—an issue Kansas law reserves for the factfinder.  The Kansas Supreme Court "has long recognized that the trier of fact must decide whether the specific conduct in any given case breaches a broadly applicable legal duty." *Granados v. Wilson*, 523 P.3d 501, 509 (Kan. 2023).  True, duty is a question of law, and "duty rules are not meant to be fact specific.  Rather, they set broadly applicable guidelines for public behavior." *Reardon ex rel. Est. of Parsons v. King*, 452 P.3d 849, 855 (Kan. 2019).  Yet the Kansas Supreme Court has cautioned courts against "defining the legal duty owed in negligence cases in ever narrower and more particularized ways." *Id.*; *see also Granados*, 523 P.3d at 509 (explaining that Kansas precedent "cautions against defining general legal duties in a more fact-specific, discrete manner in tort cases").  For example, the Kansas Supreme Court has explained that employers "do not have a duty to third parties to train or to supervise their employees." *Reardon*, 452 P.3d at 855.  Instead of such a particularized duty, employers have a general duty to exercise reasonable care, and failing to train or supervise employees could breach this general duty. *Id.*  The Kansas Supreme Court has drawn this line between general and particularized because defining "[p]articularized duties" as a matter of law usurps the jury's function. *Id.*

Here, these principles play out in a straightforward fashion.  Defendant owed a duty "to exercise ordinary care" in digging the guy-line anchor. *Rural Water Dist. No. 3*, 190 P.3d at 979.  Defendant didn't owe a particularized duty to notify plaintiff before digging; instead, it owed "a duty to exercise reasonable care under the circumstances." *Reardon*, 452 P.3d at 855.  Whether

defendant breached this legal duty by failing to notify plaintiff about its intent to excavate is a question reserved for the trier of fact. *See Granados*, 523 P.3d at 509. At this stage, the court need only consider whether plaintiff has alleged facts sufficient to make such a breach plausible. It has. Plaintiff has alleged facts that, taken as true, support a plausible inference that a reasonable company in defendant's position would have notified plaintiff before installing a large anchor within inches of a pipeline carrying millions of cubic feet of an explosive gas. Bolstering this conclusion is plaintiff's allegation that it informed defendant that it must give notice and that plaintiff had a regulatory obligation to respond to the situation. At this stage, Kansas law won't abide dismissal of plaintiff's negligence claim.

The court takes up defendant's argument under the economic-loss doctrine, next.

### B.    Economic Loss Doctrine

Defendant never seriously challenges the proposition that that it owed a duty of reasonable care, or that a reasonable factfinder could find that it breached this duty. Instead, defendant argues principally that it had no duty to prevent plaintiff from suffering purely economic damages. In other words, defendant believes that it can't incur liability in tort because it didn't strike or damage plaintiff's pipeline. Doc. 9 at 8–9, 10–12. Defendant is mistaken.

The economic-loss doctrine is a creature who emerged from the product-liability sea. *See E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 866 (1986) (limiting product liability to prevent contract law from "drown[ing] in a sea of tort"). This concept distinguishes between tort law and contract law. "In the most expansive terms," the economic-loss doctrine "is a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses." *Rinehart v. Morton Bldgs., Inc.*, 305 P.3d 622, 627 (Kan. 2013) (quotation cleaned up). "In its original form, the economic loss

9

doctrine simply prohibited a commercial buyer of defective goods from suing in negligence or strict liability when the only injury consisted of damage to the goods themselves." *Id.* That is, when a product malfunctions, injures itself, and causes purely economic damages—lost value, an unhappy customer, and increased costs of performance—then the economic-loss doctrine bars recovery in a tort action. *Id.* "Kansas courts initially took an expansive approach to the doctrine but that approach has slowed in recent years." *Lima Charlie Sierra, LLC v. Textron Aviation Inc.*, No. 20-CV-1089-EFM-GEB, 2021 WL 2477014, at *5 (D. Kan. June 17, 2021) (quotation cleaned up). The Kansas Supreme Court, in its only two cases dealing with the subject, has circumscribed the reach of the economic-loss doctrine.

In *David v. Hett*, 270 P.3d 1102 (Kan. 2011), the Kansas Supreme Court held that the economic-loss doctrine doesn't apply to claims by a homeowner against a residential contractor. There, plaintiffs claimed that a subcontractor's shoddy work had caused their home to experience "unusual settling." *Id.* at 1104. They sued the subcontractor for negligently performing the contractually required work. *Id.* Both the state trial court and Kansas Court of Appeals held that the economic-loss doctrine barred plaintiffs' claims. *Id.* The Kansas Supreme Court reversed. Relying on an admiralty decision decided by the United States Supreme Court, the Kansas Supreme Court distilled three rationales for prohibiting economic damages when a product injures itself. *Id.* at 1107–08 (citing *E. River*, 476 U.S. at 871–74). *First*, damage to products are "easily insured and the societal cost for holding a manufacturer liable in tort" isn't justified. *Id.* at 1107. *Second*, contract and warranty law are better suited to govern such controversies. *Id.* And *third*, imposing "tort liability for the economic losses suffered by parties not in privity with the manufacturer . . . would sanction indefinite damages beyond the confines of the commercial contract[.]" *Id.* *David* explained that "these policy rationales do not readily apply to parties to a

home construction contract" and thus declined to extend the economic-loss doctrine to that context. *Id.* at 1113.

Revisiting the issue again two years later—this time in the context of a negligent-misrepresentation claim—the Kansas Supreme Court again declined to animate the economic-loss doctrine. *Rinehart*, 305 P.3d at 632–33. *Rinehart* held that "negligent misrepresentation claims are not subject to the economic loss doctrine because the duty at issue arises by operation of law and the doctrine's purposes are not furthered by its application under these circumstances." *Id.* These Kansas cases thus suggest that courts, when deciding whether a claim is subject to the economic-loss doctrine, should ask whether: (1) the claim arises from a tort or contract duty; and (2) the *East River* policy considerations support application of the doctrine. *See Lima Charlie Sierra*, 2021 WL 2477014, at *5–7 (considering both the *East River* considerations and "whether the plaintiffs' claims sounded in tort or contract"). The court now applies these inquiries to plaintiff's claims here.

The first inquiry cuts against applying the economic-loss doctrine here. Plaintiff's claims sound in tort, not contract. At least as alleged in the Complaint, the parties have no contractual relationship with one another. None. The duty defendant allegedly violated arises from common law, independent of any contract. Indeed, defendant doesn't cite (and the court couldn't locate) any case where a court applied the economic-loss rule to bar a claim brought by a plaintiff who had no relationship with the defendant. Defendant focuses solely on the damages plaintiff seeks, without confronting the legal theory on which plaintiff proceeds and, in so doing, misunderstands the economic-loss doctrine.

The second inquiry also cuts against applying the economic-loss doctrine. Recall the three policy considerations at play in *East River*—whether insurance easily can cover the losses;

11

whether contract and warranty law can better resolve the dispute; and whether imposing liability would explode the potential number of plaintiffs. These "policy rationales do not readily apply" here. *David*, 270 P.3d at 1113. While plaintiff could have insured against this scenario—after all, insurance markets exist for almost any conceivable risk—the Kansas Supreme Court has suggested that this factor cuts against applying the economic-loss doctrine when, as here, the UCC doesn't govern. *See id.* at 1113–14. No contract or warranty law could resolve this case's dispute because the parties had no contract with one another. Nor is there any risk of unlimited liability; imposing liability against a digger who refuses to notify a pipeline operator only subjects the digger to a limited universe of plaintiffs. The *East River* factors thus suggest that this case isn't an appealing candidate for limiting with the economic-loss doctrine. So, the primary tests that Kansas courts have articulated counsel against extinguishing plaintiff's claims based on economic-loss doctrine because, at bottom, this is a run-of-mine negligence action.

Defendant offers no good argument to counter this conclusion. It argues that the Kansas Supreme Court has "held that in order to pursue property damage claims in negligence actions[,] there must be some physical injury to the property as the direct and proximate result of the alleged negligence." Doc. 9 at 12 (citing *Smith v. Kan Gas Serv. Co.*, 169 P.3d 1052 (Kan. 2007)). That's incorrect. The Kansas Supreme Court never has adopted such a sweeping limitation on negligence actions. *Smith* adopted a much narrower position than defendant attributes to it. It held that "to recover for the diminution in value of real property resulting from the marketplace fear or stigma alleged to have been created by a defendant's negligence, the plaintiff must establish that the property sustained a physical injury as a direct and proximate result of the negligent conduct." 169 P.3d at 1062–63. This holding—which is limited to claims

based on real-property values—plainly is inapposite. Plaintiff's claim here doesn't try to recover diminished property value.

To summarize, on the current briefing defendant has failed to convince the court that the economic-loss doctrine bars plaintiff's negligence claim. The court next takes up plaintiff's fraud-by-silence claim.

## C.      Fraud by Silence

Defendant's next argument takes aim at plaintiff's fraud-by-silence claim. It contends that the Complaint fails to allege a plausible fraud-by-silence claim. This time, defendant has the better end of the argument.

Under Kansas law, a claim for fraud by silence commands five elements:

> (1) The defendant had knowledge of material facts that the plaintiff did not have and could not have discovered by the exercise of reasonable diligence; (2) the defendant was under an obligation to communicate the material facts to the plaintiff; (3) the defendant intentionally failed to communicate to the plaintiff the material facts; (4) the plaintiff justifiably relied upon the defendant to communicate the material facts to the plaintiff; and (5) the plaintiff sustained damages as a result of the defendant's failure to communicate the material facts to the plaintiff.

*Stechschulte v. Jennings*, 298 P.3d 1083, 1097 (Kan. 2013). Defendant zeroes in on the second element, arguing that plaintiff hasn't identified any duty obligating defendant to notify plaintiff of its intent to dig. Doc. 9 at 9–10. Plaintiff's response again relies on its same negligence theories to try to conjure a duty for defendant to communicate its intent to dig. Plaintiff argues that the KUUDPA and a common-law duty to exercise reasonable care each created an obligation for defendant to communicate its intent to dig. Doc. 12 at 8–9. The court already has explained why plaintiff is wrong.

*First*, the KUUDPA doesn't govern defendant's conduct here because the KUUDPA exempts "operations related to exploration and production of crude oil[.]" Kan. Stat. Ann. § 66-

13

1802(d).  *Second*, while plaintiff is correct that defendant owed a generalized common-law duty to exercise reasonable care, defendant had no particularized duty to notify plaintiff before it installed the anchor.  *See Reardon*, 452 P.3d at 855.  Plaintiff thus has failed to allege that "defendant was under an obligation to communicate" its intent to dig to plaintiff.  *Stechschulte*, 298 P.3d at 1097.  And so, this omission is fatal to plaintiff's fraud-by-silence claim.  The court grants this part of defendant's motion.

## IV.      Conclusion

Plaintiff's negligence theory predicated on the KUUDPA isn't viable because the KUUDPA exempts operations like the ones defendant was performing.  Likewise, the court dismisses plaintiff's fraud-by-silence claim because, as alleged, defendant owed no duty to notify plaintiff that it was about to dig.  But plaintiff has stated a plausible negligence claim that defendant violated its duty of reasonable care by failing to give such notice.  So, that claim survives.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant American Warrior, Inc.'s Motion to Dismiss (Doc. 9) is granted in part and denied in part, as explained in this Order.

**IT IS SO ORDERED.**

**Dated this 26th day of March, 2026, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

14